J-S69043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF E.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.J. AND T.R., NATURAL PARENTS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1084 WDA 2017 |

Appeal from the Order June 21, 2017
in the Court of Common Pleas of Fayette County Orphans' Court at No(s):
No. 55 ADOPT 2016

| | | |
|---|---|---|
| IN RE:  ADOPTION OF: F.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  F.J. AND T.R., NATURAL PARENTS | : | |
| | : | |
| | : | |
| | : | No. 1085 WDA 2017 |

Appeal from the Order Entered June 21, 2017
in the Court of Common Pleas of Fayette County Orphans' Court at No(s):
56 Adopt 2016

BEFORE:   BOWES, J., RANSOM, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED  JANUARY 4, 2018**

Appellants, F.J. ("Mother") and T.R. ("Father") (collectively, "Parents"), appeal from the order dated and entered June 21, 2017, in the Fayette County Court of Common Pleas, granting the petition of M.W. and R.J.W.

_____

* Former Justice specially assigned to the Superior Court.

("Maternal Grandparents")[1] and involuntarily terminating their parental rights to their minor son, E.R., born in January 2014, and minor daughter, F.R., born in August 2015 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b).[2] After review, we affirm the trial court's order.

We summarize the relevant factual and procedural history as follows: The Children were born to Mother and Father, who are not married, in 2014 and 2015, respectively. N.T., 5/26/17, at 6. The Children have resided with Maternal Grandparents since birth. *Id.* at 6-8, 77-78. Initially, the Children and Mother all resided with Maternal Grandparents. *Id.* However, in January 2016, Mother, who had separated from Father shortly after the birth of F.R., left the home to reconcile with Father.[3] The Children remained with Maternal Grandparents.[4] *Id.* at 8-9.

---

[1] We observe that Maternal Grandmother's husband, R.J.W., is not Mother's biological father and is, therefore, Maternal Step-Grandfather. N.T., 5/26/17, at 4-5, 37-38. Mother's biological father, M.J., filed a petition to intervene and stay the adoption proceedings, which the trial court denied by order dated and entered April 27, 2017. Petition to Intervene and Stay Proposed Adoption Proceedings, 3/14/17.

[2] Although the trial court did not specifically reference subsections 2511(a)(1) and (b) in its order terminating parental rights, its opinion issued in conjunction with its order is suggestive of these subsections.

[3] Mother and Father have had an "on and off" relationship. *Id.* at 47, 58-59.

[4] While Mother took the Children with her overnight, she brought the Children back to Maternal Grandparents' residence the following day, where
*(Footnote Continued Next Page)*

- 2 -

Maternal Grandmother filed for custody with regard to the Children and, subsequent to mediation, an agreement was reached and adopted as an order.[5] *Id.* at 10. The order provided Maternal Grandmother with primary physical custody, and Mother and Father with partial physical custody for four hours per week at the homes of their respective mothers or, in the case of Mother, another location with notice, and other times as agreed, and, in the case of Father, the home of his father or Maternal Grandmother, or another location with notice, and other times as agreed.[6] *Id.* at 11, 99-100. In addition, the order provided for shared legal custody. *Id.* at 99. Maternal Grandmother testified that compliance with the custody

---
*(Footnote Continued)* ───────────────

they have remained since. Mother, however, has not returned to the residence. *Id.* at 9-10, 58. Notably, the Children never resided with Father. *Id.* at 77. Mother maintains that she was "kicked out" of the home due to her relationship with Father. *Id.* at 48-51. Maternal Grandmother acknowledged the unhealthy, toxic nature of the relationship and advising Mother that, in the event of a reconciliation, Mother would need to reconcile elsewhere. *Id.* at 9, 24-25. She explained her actions not as an ultimatum, but as an attempt to encourage Mother with respect to her responsibilities. *Id.* at 31. Maternal Grandmother further indicated that she urged Mother to return to the home to be with the Children. *Id.* at 10, 24. Mother expressed that she left the Children with Maternal Grandparents for fear of involvement of Children & Youth Services (CYS). *Id.* at 50. She further related her belief that CYS would have taken the Children from her given her circumstances. *Id.* at 75.

[5] Said order, dated March 23, 2016, was read into the record prior to the conclusion of the hearing. *Id.* at 98-101.

[6] Although Maternal Grandmother testified that Mother's and Father's partial physical custody of the Children was supervised, *id.* at 11, the order as read into the record does not indicate as such, *id.* at 98-101.

order "fizzled out" and Mother and Father spent a total of approximately only forty-eight hours each with the Children between the time the order was entered in March 2016 and the eventual filing for termination of parental rights and adoption in October 2016.[7]   *Id.* at 12, 16-17, 32.   Maternal Grandmother took no action to keep Mother and Father from seeing the Children.   *Id.* at 20-21.   In support thereof, Mother admitted that she was not denied access per the custody order.   *Id.* at 52, 60.   She blamed her lack of visitation on transportation.   *Id.* at 52.   Likewise, while Father asserted that he has not had access to the Children since the filing for termination and adoption, *id.* at 81, 85, he admitted that he was never specifically told that he could not see the Children.[8]   *Id.* at 87.   Critically, neither Mother nor Father sought to modify and/or enforce the custody order.[9]   *Id.* at 60, 85.   Beyond the limited contact, Mother and Father failed to provide financial or emotional support to the Children and were not involved medically or educationally/developmentally.   *Id.* at 17-19.

---

[7] Maternal Grandmother testified that prior to Mother leaving the home, Father rarely came over and, at times, would not even come to the door. Mother would sometimes bring the Children out to the car to see him.   *Id.* at 24.

[8] Moreover, Father suggested that his visitation ceased in September 2016 as his family was no longer comfortable with him maintaining visitation.   *Id.* at 79.

[9] Father testified that he did not want to "start anymore trouble or animosity than there was" or "add more fuel to the fire."   *Id.* at 85, 87-88.

Maternal Grandparents provide for the Children in all aspects: physically, emotionally, financially, medically, and educationally. *Id.* at 12-14. They have performed and continue to perform all parental duties. *Id.* at 19, 21-22, 40-41.

On October 17, 2016, Maternal Grandparents filed a petition to involuntarily terminate parental rights.[10] After several continuances, the trial court conducted a hearing on the petition on May 26, 2017. In support thereof, Maternal Grandparents each testified. Additionally, Mother and Father, represented by counsel, each testified on their own behalf. Mother's friend, S.B., also testified. By order dated and entered June 21, 2017, the trial court involuntarily terminated the parental rights of both Mother and Father.[11] On July 19, 2017, Mother and Father, through appointed counsel, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court *sua sponte* consolidated the appeals on August 16, 2017.

On appeal, Mother and Father raise the following issue for our review:

---

[10] While Maternal Grandparents did not file for termination pursuant to a specific subsection of Section 2511, they used language suggestive of subsection (a)(1).

[11] Along with its order, the trial court issued an opinion setting forth its rationale for the termination of parental rights. On July 20, 2017, the court issued a Statement in Lieu of Opinion noting the issues raised on appeal were adequately addressed in its prior opinion and no further opinion would be issued.

Did the [t]rial [c]ourt err by abusing its discretion in terminating the natural parent's rights as petitioner failed to sustain its burden of proof by clear and convincing evidence to show that the parent evidenced a settled purpose of relinquishing a settled claim to the child or refused to perform parental duties?

Parents' Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), which provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first examine the trial court's termination of Mother's and Father's parental rights under Section 2511(a)(1). We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish

parental claim to a child or a refusal or failure to perform parental duties. In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

> [I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

*In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citation omitted).

- 9 -

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted). *See*

*also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super. 2008) (*en*

*banc*).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

others provide the child with . . . her physical and emotional needs.

***In re B., N.M.***, 856 A.2d at 855 (internal citations omitted).

In the instant matter, in finding grounds for termination, the trial court concluded:

> After careful deliberation, the [c]ourt finds that biological mother's and biological father's own testimonies establish that they have failed to perform their parental duties in providing love, protection, guidance, and support, needs which cannot be met with merely a passive interest, but rather require affirmative performance and require that a parent act with genuine effort to maintain the parent-child relationship, even in difficult circumstances, not yielding to every problem. Parental rights cannot be preserved by waiting for a more suitable or convenient time to undertake child-rearing responsibilities while others provide for the [C]hildren's physical and emotional needs. As reflected in the record as a whole, neither of the biological parents undertook any affirmative actions to obtain or maintain any real parent bond with th[e C]hildren, neither of them availing themselves of their rights under an existent Custody Order, not seeking to modify the same to gain more custodial time, nor speaking with either child by telephone, nor being with their child while he was in surgery, nor financially supporting the [C]hildren, nor performing any typical parental duties, and always presenting a ready excuse for their parental failures. As an excuse for their inaction and lack of involvement with the [C]hildren, both biological parents blamed financial difficulties. Biological mother also sought to excuse herself by citing problems between herself and biological father, as well as her lack of transportation. When asked several times to give examples as to how she provides emotional support for the [C]hildren, biological mother could say only that she asked [Maternal Grandmother] about them and played with them during the few custodial periods she attended.
>
> For his part, biological father blamed both [Maternal Grandmother] and his own mother for his failure to exercise the partial custody granted to him by the Custody Order, while admitting that he took no steps to file a contempt petition or any other pleading to change the said order. He admitted that he

paid the legally mandated child support money only sporadically despite being employed and living with his grandmother in her residence. Although biological father paid lip service to his "love" for [C]hildren, nothing in the record demonstrates any love shown by either of these biological parents to the [C]hildren. Notwithstanding that both biological mother and biological father were "put on notice," so to speak, by the filing of the termination petition, they still failed to act to enforce their rights under the Custody Order, or to send any letters or cards to the [C]hildren or offer gifts on special occasions. This [c]ourt finds all of the excuses of both Mother and Father to be insubstantial and unavailing.

Based on the testimony of the witnesses and the record as a whole, pursuant to the statutory and case law of this jurisdiction, the [c]ourt finds that Petitioner, Maternal Grandmother, has met her burden of proving by clear and convincing evidence that both biological parents have utterly failed to perform any parental duties in the six months preceding the filing of her instant termination petition. Since Petitioner's husband, R.J.W., is willing and able to adopt th[e C]hildren, the [c]ourt has come to a clear, non-hesitant conviction that the termination of parental rights would be in the best interests of the [C]hildren, removing them from an unstable parental situation in which they are at best merely an after-thought to their biological parents, and providing th[e C]hildren . . . with a stable, loving, secure home where to adoptive parents would continue to provide for their physical, emotional, and medical needs by properly feeding and clothing the [C]hildren and ensuring that doctor's appointments are kept.

The [c]ourt, therefore, finds that Petitioner's request for the involuntary termination of their parental rights is warranted, and has been proven by clear and convincing evidence. The [c]ourt also finds, in light of the foregoing, that the termination of biological mother's and biological father's parental rights would be in the [C]hildren's best interests.[12]

_____

[12] We note that, although the trial court referenced only Maternal Grandmother as Petitioner, her husband, R.J.W., was named as a petitioner as well.

Trial Court Opinion, 6/21/17, at 7-9 (citations omitted) (footnote added).

Mother and Father, however, argue that Maternal Grandparents failed to meet their burden of proof as to Mother's and Father's relinquishment of a claim to the Children or refusal to perform parental duties. Parents' Brief at 9. Specifically, Mother and Father assert that Mother's parenting efforts were "frustrated" by Maternal Grandmother.[13] *Id.* at 10. We disagree.

Upon review, we find no reason to disturb the trial court's conclusions and discern no abuse of discretion. This Court concludes the trial court's determination that Mother and Father failed to perform parental duties with regard to the Children and its termination of their parental rights under Section 2511(a)(1) is supported by competent, clear, and convincing evidence in the record.

The record reveals minimal contact between Mother and Father and the Children since the entry of the custody order in March 2016, with Maternal Grandmother testifying that Mother and Father each spent a total of approximately only forty-eight hours with the Children from the time the order was entered in March 2016 and the eventual filing for termination of parental rights and adoption in October 2016. N.T., 5/26/17, at 12, 16-17,

---

[13] We note the analysis presented by Mother and Father in their brief is limited; however, to the extent we are able to determine the issues, we have considered them.

32. Further, neither Mother nor Father sought to modify and/or enforce the custody order. *Id.* at 60, 85. Moreover, beyond the limited contact, Mother and Father failed to provide financial[14] or emotional support to the Children and were not involved medically or educationally/developmentally.[15] *Id.* at 17-19. Maternal Grandparents provided for the Children in all aspects. *Id.* at 12-14, 22, 39-41. As reported by Maternal Grandmother, she and her husband provide for the Children "in every way. Emotional, financial, physical, medically -- everything. Educationally and everything." *Id.* at 12. Mother attributed Maternal Grandparents' assumption of parental responsibilities to her being "kicked out" of the home. *Id.* at 71. However, critically, Maternal Grandmother noted Mother's lack of appropriate parental contribution even when she resided in the home with the Children. Maternal Grandmother stated,

---

[14] While Father was subject to a support order, he acknowledged the existence of arrears. *Id.* at 78. Maternal Grandmother likewise referenced several contempt proceedings. *Id.* at 17, 28. Further, although Mother provided diapers and/or pull-ups and pajamas for the Children, Maternal Grandmother indicated this was on one occasion. *Id.* Mother admitted she never actually gave Maternal Grandparents money. *Id.* at 61-62. Similarly, Mother reported only one birthday gift and card for E.R. since Children's births, as she did not have the means financially. *Id.* at 53, 62.

[15] Mother signed an authorization for Maternal Grandmother to oversee E.R.'s early intervention therapy. *Id.* at 20. Additionally, despite knowledge, neither Mother nor Father attended E.R.'s surgery or came to visit him. *Id.* at 17-18, 33-36. Maternal Grandmother testified that Mother did not appear for her visitation scheduled the following day and did not make inquiry until several days later. *Id.* at 36.

> Well, I mean [Mother] lived with us for a time. She was involved at that time, physically, but still not the way that she should have been. I had to wake her up and tell her this one needed fed and this one needed changed. No. It has been pretty much my husband and I doing everything since day one.

*Id.* at 19.

Further, when asked to specifically recount her parental duties from the time she left Maternal Grandparents' home until the filing of the instant petition (January to October 2016) Mother was unable to detail any such duties performed. *Id.* at 57. Maternal Grandmother essentially described Mother's interactions with the Children during visitation as "play." *Id.* at 32. This was confirmed by Mother. *Id.* at 74. When asked if she would describe Mother's relationship with the Children as a parental relationship, Maternal Grandmother responded, "Not necessarily. There is a huge difference between what I do with them and what she would do with them while she was there." *Id.* at 33. As to Father, Maternal Grandmother further recounted Paternal Grandmother having to prompt Father to respond to F.R. when she fell during visitation. *Id.* For instance, she testified that "at one point [F.R.]-she was leaning on the ride on toy and she went down. She started to cry and [Paternal Grandmother] had to tell him on the other side of the room. . . that is your daughter, she is crying. Go get her. His first instinct was not oh my gosh is she okay." *Id.* Significantly, Maternal Grandmother observed that Mother's and Father's involvement "got worse" after the filing of the instant petition and for adoption. *Id.* at 20.

With their position, Mother and Father suggest that the trial court delay stability and permanency for the Children while Mother and Father seek to attain their own security. This is both speculative and unacceptable.[16] As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). The Children are in a stable and secure environment with Maternal Grandparents, who have provided for them since Mother left the home in January 2016, if not their entire lives. As aptly stated by Maternal Step-Grandfather, "[The Children] don't need to wait around for [Mother and Father] to grow up. [The Children] are growing up and they don't need to wait for [Mother and Father]." *Id.* at 41. He continued, "They need parents now. . . ." *Id.* at 42. With this, we agree. Thus, as the trial court's determinations regarding Section 2511(a)(1) are supported by competent, clear, and convincing evidence in the record, we find no abuse of discretion. *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267; *In re Adoption of T.B.B.,* 835 A.2d at 394.

_____

[16] Mother and Father were moving to Allegheny County the day after the hearing to be closer to their new job in direct sales, which is commission-based and keeps them out of the home for long hours. N.T., 5/26/17, at 46, 62, 77, 80, 82, 88-91.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa.Super. 2012). In **In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]**, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

**In re T.S.M.**, 620 Pa. at 628-29, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks, quotation, and citations omitted).

Here, the record likewise corroborates termination of parental rights pursuant to Section 2511(b). The evidence supports that Mother and Father had minimal contact with the Children, at least, since March 2016. As a result, no evidence was presented that a parental relationship or bond of any significance existed between Mother and Father and the Children. In fact, Mother testified that F.R. does not know who she is. *Id.* at 52. All evidence suggests that the parental relationship is instead between Maternal Grandparents and the Children. Maternal Step-Grandfather indicated that the Children call him "Pap" and are excited to see him when he gets home from work. *Id.* at 38. He further stated that he considers himself a father figure to the Children. *Id.* Maternal Grandparents love the Children, who have resided with them since birth, and desire to provide them with stability and security. *Id.* at 22, 38-39, 41. Maternal Grandparents have provided for the Children's daily needs, providing for the Children physically, emotionally, financially, medically, and educationally, when Mother and Father could not and/or would not. *Id.* at 12-14.

Thus, as confirmed by the record, termination of parental rights serves the Children's needs and welfare. While Mother and Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we have stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d at 856. It is speculative when, if ever, Mother and Father will be able to assume parental responsibilities for the Children and provide them with the stable environment they deserve.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's and Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b). We, therefore, affirm the order of the trial court.

Order affirmed.

Judgment Entered.

- 19 -

Joseph D. Seletyn, Esq.
Prothonotary


Date:  1/4/2018

Joseph D. Seletyn, Esq.
Prothonotary